IN THE MATTER OF THE APPLICATION OF THE
ASSISTANT COMMISSIONER OF SOCIAL WELFARE
FOR THE CUSTODY OF: LEDESMA Children: Candito, Jr.,
Hilda Julia, Leonardo, Carlos, Angel, Ismael, Orlando, Hector,
Mirna, Olquita, Victorino, Libertad, Rita, Baby Ledesma

## Family No. 977-77

## Territorial Court of the Virgin Islands

### Div. of St. Croix

## January 27, 1978

PATRICIA N. YOUNG, ESQ., Assistant Attorney General
(Department of Law), Christiansted, St. Croix, V.I.,
*for petitioner*

JEAN–ROBERT ALFRED, ESQ., Christiansted, St. Croix, V.I.,
*Guardian ad litem*

DEREK M. HODGE, ESQ. (HODGE & SHEEN), Christiansted, St. Croix, V.I., *for Candito Ledesma*

EDDY RIVERA, ESQ., Christiansted, St. Croix, V.I., *for Hilda Rosa Ledesma*

SILVERLIGHT, *Judge*

MEMORANDUM OPINION AND ORDER

This is an action brought by the Department of Social Welfare for temporary custody of 14 minor children. Involved are the children of Candito Ledesma and Hilda Rosa Ledesma, his wife, whose names and ages are, respectively, Candito, Jr. (16 years); Hilda (15 years); Leonardo (14 years); Carlos (12 years); Angel (11 years); Ishmael (10 years); Orlando (8 years); Hector (7 years); Mirna (6 years); Olga (5 years); Victorino (4 years); Libertad (3 years); Rita (2 years); and Magdalena (1 year). Each of these children, given the appropriate factual setting, falls within the jurisdiction of this Court pursuant to the provisions of 4 V.I.C. § 172.[1]

█ A similar proceeding filed prior to the case sub judice was tried in the Territorial Court and resulted in a dismissal of that petition on August 31, 1977. Therefore, the substance of this case was restricted to evidence commencing in time span on August 31, 1977, and continuing thereafter to the date of hearing, this Court having taken the position that any evidence relative to a period prior to August 31, 1977, was res judicata and not

---

[1] "... the juvenile and domestic relations division of the municipal court shall have jurisdiction in proceedings: (1) Concerning any child under 18 years of age living or found within the judicial division (A) who is neglected as to proper or necessary support or education as required by law, or as to medical, psychiatric, psychological or other care necessary for his well-being, or who is abandoned by his parent or other custodian, (B) whose occupation, behavior, condition, environment or associations are such as to injure or endanger his welfare or that of others, (C) who is beyond the control of his parent or other custodian ..."

proper subject matter for consideration by this Court in this proceeding.[2]

This petition was filed on September 30, 1977, by the Department of Social Welfare seeking the temporary care, custody and control of the above-named minors for the purpose of fulfilling its statutory duties by providing these minors with, among other things, foster homes. The petition, in substance, alleges that Hilda Rosa Ledesma (hereinafter sometimes referred to as "mother") has voluntarily given the custody of the subject minors to the Department, while Candito Ledesma (hereinafter sometimes referred to as "father") has neglected to perform and has otherwise failed to meet his responsibilities as a husband, father and provider for his family. The Department further alleges that the mother suffers from poor health, and is overburdened by the home problems created by such a large family; that the children are malnourished, physically underdeveloped and chronic under-achievers, at least in part as a result of their home life; that the three youngest children are chronically ill; that the school-age children are often truant; that the older boys are engaged in delinquent behavior; that the father is tyrannical and excessively abusive to the children; and, finally, that by reason of all of these deficiencies in the family interrelationships, the home situation continues to deteriorate, despite counselling services which Social Welfare has attempted to provide.

The matter came on for hearing on November 2, 1977, upon due and proper notice to all parties, at which time this Court entered an interim order granting to Social Welfare the temporary custody of all the minors, "in order to insure

---

[2] Some evidence was admitted for the purpose of clarification which related back to a date prior to August 31, 1977, but it was utilized for the sole purpose of clarification and not as a basis for determination of the issues.

that their health, safety and best interests are preserved,"[3] until a full and plenary hearing of the matter could be held. In order to insure that the rights of all parties were adequately protected, there being apparent conflicts of interests as between mother, father, and children, arrangements were made for representation of the mother by Eddy Rivera, Esq.; the father was represented by Derek M. Hodge, Esq.; and Jean-Robert Alfred, Esq. was appointed guardian ad litem of the children.[4] Furthermore, the Department was directed to make, "a further study of the status of the children both insofar as to parental relationships, home life and health (sic)..."[4a]

On December 14, 1977, a lengthy hearing was held during which the Social Welfare caseworker who had been assigned to and had worked with the Ledesmas testified about the conditions and behavior she had observed within the Ledesma household. Additionally, a full opportunity was proffered to all members of the Ledesma family who wished to be heard, and careful consideration was given to the testimony presented by them, particularly regarding the sometimes impassioned pleas to retain the family as a single unit.

Emotions do not form a foundation upon which the blocks of life may be built, and this Court, therefore, looked to all of the factors, regardless of remoteness, which it felt in any way significantly affected the determination of the issue of "the best interests of the children."

Simply stated, it is my conclusion that Mr. and Mrs. Ledesma lack the mental and emotional stability and ability at this time to adequately care for and raise their 14

[3] See Order entered November 2, 1977.

[4] Appointment of the guardian ad litem was made pursuant to 15 V.I.C. § 827; appointment of counsel for the mother was made pursuant to 4 V.I.C. § 513(d).

[4a] See Order entered November 2, 1977.

children. An outline of the pertinent facts which lead me to that conclusion, while not all inclusive, follows.

The Ledesmas live in a 5-bedroom Housing Authority apartment for which they pay $10.00 per month. The testimony of all witnesses confirmed that the apartment windows are commonly kept tightly shut, cutting out both light and air. There is no doubt that the home is seldom cleaned and that the rooms of the younger children exude a strong odor of urine and feces.

The three infants, aged 3, 2, and 1, respectively, are kept almost exclusively in their cribs. The social worker, on her first visit with the family, discovered these three infants suffering from a severe anal and genital rash which apparently resulted from their being left in sodden diapers or lying on urine-soaked mattresses for long periods of time. The lack of medical attention or parental supervision had caused the youngest of these children to scratch the area where the rash was present until it bled, but even in this state, no effort was made to procure medical assistance until the social worker, on her own initiative, took the necessary steps to accomplish the same.

The babies are considered by the mother to be an inconvenience and burden to her and she, therefore, often ignores them. As a result, the care of these children has been imposed upon Mirna, a six-year-old child who, by crawling into their cribs, changes their diapers, feeds them their bottles, and performs whatever other comforting acts she, within the limitations of her tender years, may perform on their behalf.

Rita, 2 years of age, has acquired a habit or inclination to strike her head against the headboard of the crib continuously (whether this is the result of medical infirmity or simply an attempt to gain attention is unknown), but the only interest in this unusual situation evidenced by either

mother or father is to beat Rita into submission or until she has quieted down.

Libertad, aged 3, is hydrocephalic and physically handicapped, living almost a vegetable existence without physical therapy or regular medication, for no more substantial reason than the failure of the mother to keep the medical treatment appointments made by the Department. As a result of this shocking and almost unbelievable neglect and unconcern, this child is restricted to lying in her crib and crying. But the lack of concern of these parents does not conclude here.

Magdalena, aged 1 year, was found, at the time of the social worker's first home visit, to weigh only 14 pounds, considerably below the norm for a one-year-old child. She had failed to master the simple act of crawling, which is common to children of this age, because of the emotional, medical, and nutritional neglect which she suffers. Most disturbing to this Court, she was found to be suffering from an eye infection which had caused both eyes to be swollen almost shut for over a week without any action on the part of the parents to determine the cause or treat the effect.

These few comments are indicative of the appalling lack of concern, understanding, compassion, emotional interest, and parental responsibility of not only the mother, but by extension, the father, who could not help but see the same sights which the social worker saw. As a human being, having sired these children, he can be held to no lesser degree of liability for their care and upbringing than his wife.

This tale of parental apathy does not end at this point, however. The evidence further discloses that 4-year-old Victorino lives in the same familial atmosphere of deprivation and unconcern. Even at this age, he has not been toilet-trained and consequently has been refused admission to pre-school facilities. Furthermore, and to further empha-

size the lack of parental and environmental stimulus in his home, it is to be noted that he is only now beginning to learn to speak in sentences, is anemic, and is in need of additional medical and dental care.

The four children to whom I have thus far referred are the youngest and most helpless members of the family. They are, because of the failures of their parents, developmentally retarded, and whether this be due to nutritional or emotional deprivation, it shocks the conscience of this Court that their parents accept no responsibility for this condition. This Court sat in an aura of dismay and horror as it heard testimony in which father blamed mother for the neglect of these children, while mother, in response, evidenced an overwhelming lack of comprehension of the simple fact that these four infants had any problems of any nature whatsoever.

It was unnerving, to say the least, for this Court to hear of Mrs. Ledesma's lackluster support of the Department's caseworker in meeting the medical needs, treatment, and appointments set up for her children, of her refusal to accept recommendations for better ventilation, supplementation of diet, exercise of greater hygiene, and even for minimal emotional stimulation for the infants. The efforts of the Department to help Mrs. Ledesma cope with the numerous responsibilities placed upon her as the mother of 14 children were further aborted by her refusal to allow a homemaker provided by the Department assist her in cleaning and cooking, and providing care for the children, for the reason that, as both she and Mr. Ledesma put it, the homemaker just interfered in their household.

This behavior by both father and mother can only be viewed by this Court as additional evidence that these biological parents acted from selfish pique rather than as loving parents interested in the welfare of their children.

As unbelievable as it may seem, the monumental failings of this family unit have still not ended, for the school-age children seem to have fared little better than their infant siblings. The record is replete with evidence of the bitterness, rebelliousness and lack of discipline attributable to each of these older children. 16-year-old Candito, Jr. has not attended school for approximately two years last past, and, since the age of 12, has been well-known to the Juvenile Bureau of the Department of Public Safety. He repeatedly defies and argues with both his father and mother, does not hesitate to strike his mother, and uses bullying tactics towards his siblings. Even at his age, his parents are unable to exercise any control over him and he, in turn, is either unwilling or unable, or perhaps both, to control himself.

Solely for purposes of illustration, this Court makes note of a portion of the hearing of the matter sub judice which can be best described as a tempestuous appearance by Candito, Jr., resulting in the necessity for his restraint by the marshal. It was only after the Court actually had the marshal remove Candito, Jr. from the courtroom, hold him in ostensible custody in the marshal's office for a period of several hours, and then return him to the courtroom to be given an opportunity to express himself, that he was able to control his outbursts and emotionalism sufficiently to indicate what to him was the simple desire to be "let alone" by the Government and to have his family remain free from governmental interference. Such a course of action, this Court believes, would only lead to further tragedy for the Ledesma family in general, and Candito, Jr. in particular.

Hilda, at age 15, has adopted an attitude similar to that of Candito, Jr. She attends school irregularly and views the world with disrespect and hostility. She acts as a catalytic agent and participates in creating the battleground atmosphere which is present daily in the family home. As with

the other Ledesma children who are frequent truants (as will be hereinafter noted), her truancy arises quite often because she "oversleeps" or because she has no clean school uniform. All efforts of the Department to alleviate her chronic truancy have been unavailing.

Carlos, 12 years of age, joins Hilda and Candito, Jr. as an active disruptive element to family harmony. He is a frequent truant from his special education classes and is admittedly beyond the control of his parents. His behavior in school has been disrespectful to his teachers, and aggressive and anti-social to his peers. Both father and mother express the belief that he is mentally ill, but both concede that they have made no effort to seek medical diagnosis, treatment, or even counselling for this troubled child.

Olga, 5 years of age, dropped out of the Head Start program in which she had been enrolled and now is frequently truant from kindergarten. Hector, 7 years of age, is repeating the first grade substantially as a result of frequent truancy due to an alleged lack of school uniforms, or simply because he is allowed to remain at home. At the time of the hearing, the caseworker testified that she had probable cause to believe that he was infested by parasites but remained untreated.

Repeating the first grade for the third year in a row is Orlando, 8 years of age. He has reading problems, needs eyeglasses, is constantly poorly clothed, and requires dental attention. Similarly, Ishmael, 10 years of age, is repeating the second grade and, like his brother, is in need of eyeglasses. Although the Department arranged for a pair of eyeglasses to be fitted and given to Ishmael, he threw them away, apparently with the blessings of his parents who made no effort to recover or replace them.

Angel, 11 years of age, is also performing below grade level and, although he exerts substantial effort, remains an underachiever. Sadly, he also is often truant, again because of an alleged lack of school uniforms. The only inference that can be reasonably drawn from these facts is that the Ledesma parents attach so little importance to education that they do not consider it worth either the slightest effort to provide uniforms for their children or the exertion of minimal discipline to curtail the chronic truancy in which their children engage.

Only two children appear to have escaped the unhappy downward path of their siblings. Leonardo, 14 years of age, is described as a very good student who possesses the mental and emotional potential to overcome the chaos which exists within his home. Similarly, 6 year old Mirna is described as alert, pleasant, and doing well in school. Despite the obstacles which have faced her, she has managed by her own efforts to claw her way out of this den of despondency and destructiveness and remain a tiny pillar of stability, standing alone in the morass of this family.

The distressing state of the children's physical, psychological and emotional well-being is the product of the poor relationship between husband and wife. They, as parents, choose to attribute their problems solely to economic difficulties which arise out of raising such a large family. There is no doubt that substantial economic difficulties do exist, but Mr. Ledesma is now employed, earning between $100 and $300 per week, the family resides in an apartment for which a nominal rent is paid, and an Aid For Dependent Children grant of $564 per month had been received up to the time of trial.[5] To supplement these items, the family has been receiving food stamps having a value of $722, although the father testified that the family food expendi-

---

[5] This grant may have been terminated at this time by reason of the fact that the father has now returned to the marital abode and is employed.

307

tures approximated only $125 per week.[6] The family receives free medical services through the Department of Health's Medical Assistance Program and, therefore, need make no expenditure for medical treatment or medications. Where, then, is the income of the father being utilized? Would one not expect that income to be utilized, at least in some measure, to alleviate the economic straits which have been described? The record is oddly silent on this point.

This Court concludes that the problems which these parents face are much deeper and more complex than simple economic deficiency. They arise out of and are for the most part the result of the parents' limited capacity to deal with the demands of the extraordinarily large family they have established; they lie within and arise out of their total incomprehension of the responsibilities connected with the proper care and nurture of the children they profess to "need" to remain around them in order that they may "feel good;" they arise also from an apathetic, disinterested attitude toward these children.

What has been said and remains to be said by this Court is not intended to point the finger of shame or criminality at Mr. and Mrs. Ledesma. On the contrary, what has been said and remains to be said is in furtherance of this Court's concern with that which constitutes the welfare and best interests of the Ledesma children rather than the Ledesmas' "need" to "feel good."

The evidence presented to enable this Court to reach its conclusions has surpassed the level of mere preponderance and has attained the status of clear and convincing evidence of the parents' present lack of concern and ability to properly raise these children. It is clear and convincing

---

[6] Mathematical computation discloses an expenditure of approximately $1.50 per person per day based on the $722 food stamp grant. It comes as no surprise to the court then, that almost every member of the family suffers nutritional deficiency, anemia, or both, with consequent developmental retardation.

because of the uncontroverted proofs of a diet composed chiefly of rice, canned milk, and cold snacks; of repeated disregard of medical needs and treatment of the children; of a lack of any parental stimulation, display of affection or emotional support; of the unhygienic conditions of the house and the children; and of the absolute lack of guidance, control and discipline of the minors.

I expressly find that Mr. Ledesma is presently unable to comprehend his obligations to his family. Throughout the entire history of this case, he has remained intractable and obdurate to all suggestions or assistance offered by the Department of Social Welfare, even though it was Mr. Ledesma who first initiated the request for governmental involvement. Although there is no evidence of any objection to such governmental involvement by Mrs. Ledesma, both father and mother now indignantly insist that the Department of Social Welfare, in its attempt to fulfill its statutory duties, should make no demands for concessions upon them to alter the narrow, inadequate, and inappropriate concept of family responsibility from which both of them suffer.

From the foregoing, this Court concludes that the Ledesma family situation has deteriorated far beyond the point of casual correction. The parents lack the mental ability to deal with their present situation, and they need help and guidance to avoid further victimization of the innocent children which between them they have produced. A radical solution is required but such solution, of necessity, must be sufficiently flexible and of sufficient time span to deal with the multiple problems which have been here described.

By order entered November 2, 1977, temporary custody of all 14 children was granted to the Department of Social Welfare and, pursuant to that order, all of the children were placed in foster homes, excepting Candito, Jr., Carlos,

and Libertad, for whom no foster family could be found by reason of their special problems.

■ Mrs. Ledesma now urges that there is no authority reposed in the Department of Social Welfare to petition for custody of minors and that, therefore, the Court cannot now grant custody of these children to the Department. Mrs. Ledesma's counsel is mistaken in his reading of the statutes relative to this matter. As mentioned previously and as conceded by all parties, the Territorial Court has jurisdiction over any minor "who is neglected as to proper or necessary support or education as required by law, or as to medical, psychiatric, psychological, or other care necessary for his well-being, . . ." or "whose occupation, behavior, condition, environment or associations are such as to injure or endanger his welfare or that of others," or "who is beyond the control of his parent or other custodian." 4 V.I.C. § 172.

The Ledesma children on the foregoing findings fall squarely within those provisions. Furthermore, the Department of Social Welfare is expressly obligated, as one of its many duties, to take the very action which it took in the case sub judice.[7] The public policy enunciated by the aforementioned statutes and those cited, infra, clearly evidences an intention that any person may initiate the exercise of jurisdiction by the Court under section 172, supra, if a child be neglected, endangered, or beyond control. 5 V.I.C. § 2502 expressly provides for such action.[8]

---

[7] 3 V.I.C. § 384(b: "The Department shall—

(3) plan, administer, and operate all publicly supported child welfare services, institutions, and programs for the protection and care of children who are dependent, neglected, or delinquent, or are in danger of becoming delinquent, or who may otherwise be in need of public protection or care, including services to children in their own homes, in foster family care, in boarding homes, or in institutions; . . .

(8) plan, administer, and operate programs providing special services for persons in need thereof because of age, illness or destitution;"

[8] "§ 2502. *Information; investigation; complaint*

Whenever any person informs the court that a child is within the purview of section 172 of Title 4, the court shall make a preliminary inquiry to

When read in light of the term "person" as that term is defined in 1 V.I.C. § 41,[9] and as that definition is further clarified in United States v. Coumantaros, 165 F.Supp. 695 (D.C. Md. 1958) and Burke v. Railroad Retirement Board, 165 F.2d 24 (D.C. Ct. of App. 1947), it is clear that this governmental agency is a "person" having the authority to institute actions pursuant to the statutes cited.

Such an action having been instituted, the Court may now exercise its jurisdiction pursuant to 5 V.I.C. § 2506, hold a hearing, and, in appropriate circumstances, "commit the child to the custody or to the guardianship of a public or private institution or agency authorized to care for children or to place them in family homes, or under the guardianship of a suitable person" or to "order such other care and treatment as the Court may deem best . . . when the judge deems such requirements necessary for the welfare of the child." It follows that if the Court exercises its authority by granting custody of children to the Department of Social Welfare, whether temporary or permanent, that agency is required to receive them and to determine "the type of care and placement needed by the individual child; and [to] provide such care and placement, as facilities are available, including placement in the training schools or in boarding or foster homes." 34 V.I.C. § 104.[10]

---

determine whether the interest of the public or of the child require that further action be taken. . . ."

[9] "§ 41. *Words denoting number, gender, etc.; definitions*

As used in this Code or in any Act of the Legislature, unless it is otherwise provided or the context requires a different construction, application, or meaning—

. . . 'person' and 'whoever' respectively include corporations, companies, associations, joint stock companies, firms, partnerships, and societies, as well as individuals;"

[10] V.I.R.&R., Title 34, § 104–61 provides for the cases in which a home must be broken up temporarily. The rule states:

". . . The preservation of the child's own home is therefore the primary aim

311

The Court and the Department of Social Welfare have exercised both statutory and constitutional procedural due process in all respects in the case at bar. The requisite study of the status of these children and the need for their placement in foster homes or for other care or treatment has been made.

■ Absent the facts which have been enunciated here at great length, there is no doubt that the best interests of these children would be primarily served by retaining and preserving an integral family unit. This position is supported by Title 34 V.I.R.&R. § 104–61. This primary consideration must give way, in the context of the familial environment and all of the detrimental aspects thereof, to such remedial steps as are appropriate.

■ This Court is extremely hesitant to put aside entirely the concept of retention of strong family ties, notwithstanding all of the detrimental aspects of the familial environment to which we have alluded, and the clear need for radical, immediate, and decisive action to prevent a total submersion of the individual personalities, characters, and future hopes of attainment of any of these children. In the overall picture, intertwined in the testimony of all members of the family who participated in the hearing, a strong family bond was evident, and this Court deems such a bond to be the first step in the reconstruction of an integral family unit. In order to direct this family and its individual members along the path of such reconstructive activity, I conclude that the Department of Social Welfare should be granted temporary custody of all of the Ledesma children for at least a six month period.

---

of the Child Welfare Program. In spite of every effort to preserve a home, certain children must live away from their own homes, temporarily or permanently, in order to have a chance to develop a healthy personality and grow into good citizens. . . ."

I further conclude that the Department of Social Welfare should make all reasonable efforts to group the children in foster homes with as many of their siblings as is reasonably possible to maintain their family identity and solidarity.[11]

Every effort should be made by the Department during this period of temporary custody to arrange for and maintain regular family visitations between the children and parents, to provide transportation and assistance as needed, and further to provide counselling services and any other aid which the Department can render to assist both the children and Mr. and Mrs. Ledesma to come to an understanding of the disruptive factors which have developed in their home as the result of the parental disputes, the lack of parental control, and the loss of respect for the parents by the children.

I conclude that the rendering of the services to which I have just alluded, in addition to assisting the Ledesmas in understanding the basics of nutrition, the budgeting of money so that it may be adequately utilized for the purchase of food, medical care and other necessities, and the need for careful adherence to the medical programs necessary for the health of all of the children as well as the parents, will permit this Court within a period of six months, and upon a full hearing, to determine whether there is any reasonable hope that this family can be reunited.

If, upon such hearing, it is determined that no such hope reasonably exists, this Court may then exercise its jurisdiction by granting permanent custody of these children to the Department since clearly their best interests will demand such action. At that hearing, the Court will consider,

---

[11] In light of the testimony concerning the improvement of the children's health and happiness following their placement in foster homes, and the present arrangement wherein seven children have been placed in the Melendez home, three in the O'Keefe home, and one in the Miller home, it is clear that the Department is following this reasoning and should be commended therefor.

among other factors, the good faith efforts of the Ledesma parents to modify their heretofore intractable adherence to their own selfish desires and attitudes, the Ledesmas' interest in the health, growth and happiness of their children as exhibited to the social workers in their conferences and other contacts with the Department representatives, and any and all other factors which may, in any way, evidence some relationship to the ultimate goal of attaining that which constitutes the best interests and welfare of the children.

It goes without saying that during the period of temporary custody referred to herein, the Department shall continue to offer all services, testing, medical treatment, psychological treatment, and any other available assistance which may be necessary for Libertad, Carlos and Candito, Jr. in particular, and all of the Ledesma children as well as Mr. and Mrs. Ledesma in general. This Court will expressly retain jurisdiction in order that any necessary and appropriate motions directed to the welfare and best interests of these children may be heard without delay.

ORDER

On the findings of fact and conclusions of law recited above, it is

ORDERED, ADJUDGED AND DECREED that the temporary custody of the Ledesma children, to wit: Candito, Jr., Hilda, Leonardo, Carlos, Angel, Ishmael, Orlando, Hector, Mirna, Olga, Victorino, Libertad, Rita and Magdalena, be and it hereby is granted to the Department of Social Welfare for a period of six months from the date of entry of this order, at which time this matter shall be set down for a full and further plenary hearing to determine whether such temporary custody should be continued, permanent custody should be granted to the Department, or custody should be returned to the

parents, Candito Ledesma and Hilda Rosa Ledesma; and it is further

ORDERED, ADJUDGED AND DECREED that the Department of Social Welfare shall be permitted to perform any and all acts authorized by law, including but not limited to the rendering of testing services, medical or psychological treatment, counselling services, placement of the children in foster homes, training in the areas of nutrition, budgeting of family finances, child care, and any and all other health services which the Department shall deem appropriate; and it is further

ORDERED, ADJUDGED AND DECREED that the Court shall retain jurisdiction of the subject matter and the parties pending further hearing on notice to all parties.